# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **ANDREA N. COCKREAM,** | ) | |
| **Plaintiff,** | ) | **No. 13 C 6483** |
| | ) | |
| v. | ) | **Magistrate Judge Geraldine Soat Brown** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINON AND ORDER</u>

Plaintiff Andrea Cockream brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. §§ 421, 423. (Compl.) [Dkt 1.][1] Plaintiff filed a memorandum in support of reversing the decision of the Commissioner of Social Security. (Pl.'s Mem.) [Dkt 19.] The Commissioner filed a motion for summary judgment [dkt 23] with a memorandum in support. (Def.'s Mem.) [Dkt 24.] Plaintiff replied. (Pl.'s Reply.) [Dkt 31.] The parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). [Dkt 12.]

For the reasons set out below, the Commissioner's motion is granted.

---

[1] The regulations regarding DIB and SSI are substantially similar, and where they do not significantly differ, only one section will be cited. *See Ashpaugh v. Apfel*, No. 98 C 6561, 2000 WL 1222153 at *1 n. 3 (N.D. Ill. Aug. 22, 2000).

## PROCEDURAL HISTORY

Plaintiff applied for benefits on August 6, 2010, and the agency denied her claims initially and on reconsideration. (R. 66-69, 73-79, 150-63.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (R. 115-27), which was held on April 2, 2012 (R. 39-65). On May 8, 2012, the ALJ denied Plaintiff's request for benefits. (R. 24-33.) The Appeals Council declined Plaintiff's request for review (R. 1-4), making the ALJ's decision the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

## BACKGROUND

Plaintiff was 32 years old when she applied for benefits, alleging that she became disabled a year earlier because of a back injury and arthritis in her right knee. (R. 152, 190.) Before applying for benefits she worked primarily as a cashier and manager at fast-food restaurants. (R. 191.) Her last job was working in a laundromat, cleaning washers and dryers and folding clothes. (R. 44.) Her application for benefits indicated that she finished eleventh grade, but Plaintiff testified at her hearing that her husband made a mistake when he filled out the form, and she actually only finished seventh grade. (R. 56, 190.)

### Medical History

In early 2009, Plaintiff began visiting Dr. Moses Tomacruz with complaints of lower back pain. (R. 323, 325, 327.) Dr. Tomacruz noted that Plaintiff had a history of chronic back pain because of a herniated disc. (R. 323.) He also observed that she had been managing the pain with physical therapy and medication, but that her pain nonetheless ranged from 6 to 10on a scale of 10. (R. 323,

325, 327.) Dr. Tomacruz ordered an MRI, which revealed mild disc disease with a slight loss of disc height and partial disc desiccation in the mid-lower back (the "T12-L1" vertebra), and mild loss of disc height, partial desiccation, and small to moderate disc protrusion into the left foramen resulting in moderate stenosis in the lower back (the "L4-L5" vertebra). (R. 355.)[2]

In July 2009, Plaintiff discussed her lower back pain with Dr. Dongwoo Chang. (R. 290.) She reported having back pain since childhood that had gotten worse over time. (*Id.*) Dr. Chang noted that Plaintiff described her pain as eight or nine out of ten (and as "sharp and dull" with "pins and needles sensations"), but that she had not undergone epidural injections. (*Id.*) After reviewing the MRI, Dr. Chang concluded that there was evidence of degenerative disc disease at the L4-L5 level and recommended epidural injections and continued physical therapy. (R. 291.) Around this time, Dr. Tomacruz also noted that Plaintiff's back pain was rated as severe and exacerbated by flexion, extension, sitting, and standing. (R. 303.) Plaintiff continued to take pain medication. (R. 303-04.)

In September 2009, Plaintiff followed up with Dr. Chang, who noted that Plaintiff's pain-management specialists did not think that injections would make a difference. (R. 286.) He scheduled Plaintiff for spinal-fusion surgery. (R. 282, 286.) In early November, a pre-surgery CT scan confirmed lumbar disc disease, with chronic L4-L5 disease and likely impingement of an L4 nerve root. (R. 320-21.) Later that month, Plaintiff underwent a lower lumbar spinal fusion and

---

[2] T12 and L1 referred to the vertebra at the very top of the lumbar region of the vertebral column (the back bone); L4 and L5 are the last vertebra in the lumbar region. *Dorland's Illustrated Medical Dictionary* 2050-51 (32d ed. 2012) [hereinafter *Dorland's*]. The spinal foramen are the large openings formed by the body and arch of the bones in the back. *Id.* at 730. Spinal stenosis is the "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space." *Id.* at 1770. Desiccation is "the act of drying." *Id.* at 500.

laminectomy.  (R. 317-18.)[3]

Shortly after surgery, Plaintiff reported to Dr. Chang that her pain and numbness had improved but that she still had moderate cramping in her right leg and pain in both hips.  (R. 278.)  She continued to take pain medication.  (*Id.*)  Dr. Chang found that she was "in no acute distress."  (*Id.*)  Two months later, in January 2010, an x-ray showed "satisfactory postsurgical appearance of the lumbar spine."  (R. 316.)  At the same time, however, Plaintiff complained to Dr. Tomacruz that she still had "severe pain" ("10/10 in intensity") in her back that radiated to her left foot.  (R. 299.)  Dr. Tomacruz noted that she was taking her pain medication "more than she should," but he nonetheless increased the frequency of her prescription.  (*Id.*)  He also observed that her surgical scar was well healed with no swelling or redness of the skin.  (*Id.*)[4]  He recommended that she return in three months. (R. 421.)  In March 2010, a follow up CT scan showed "[c]ontinued satisfactory postop appearance."  (R. 315.)

On August 2, 2010, Plaintiff had an MRI taken of her right knee on order of Dr. Rafael Guerra because of complaints of chronic pain in that knee.  (R. 397.)  The MRI showed no significant joint effusion (the escape of fluid into a part of the body), and no evidence of meniscal tear.  (*Id.*)  The tendons and ligaments were intact.  (*Id.*)  There was a small amount of fluid in a cavity behind the knee and mild softening of the cartilage in the knee cap.  (*Id.*)[5]

---

[3] A laminectomy is an "excision of the posterior arch of a vertebra."  *Dorland's* at 1003.

[4] Dr. Tomacruz noted that there was no erythema, which means "redness of the skin produced by congestion of the capillaries."  *Dorland's* at 643.

[5] The radiologist technically recorded a "semimembranosus-gastrocnemius bursa" with "mild increased signal seen in the cartilage overlying the lateral facet of the patella compatible with mild grade chondromalacia."  (R. 397.)  That description indicates that a saclike cavity (the bursa) was located behind the patella, *i.e.*, the knee cap.  *Dorland's* at 262-63,  1395.  Chondromalacia is

On August 21, 2010, Plaintiff was seen by Dr. Mitchell Goldflies on a referral from Dr. Guerra. (R. 389.) Plaintiff reported that she had fallen from the stairs three days earlier and was experiencing pain at a severity of 10 out of 10 in her right knee. (R. 389.)[6] Dr. Goldflies diagnosed a patellar femoral sprain and recommended physical therapy and a rehabilitation program. (R. 389.)

On August 31, 2010, Plaintiff's husband submitted a function report to the Social Security Agency about her limitations. (R. 198–205.) The report is written partially in first person, from Plaintiff's perspective, but signed by her husband. (R. 205.) The report states that Plaintiff could not lift anything, stand or sit for long periods of time, or walk for more than about two hours. (R. 198, 203.) It also notes that Plaintiff used a back brace since her surgery in November 2009. (R. 204-05.)

On October 5, 2010, Dr. Pranjal Shah conducted a consultative examination of Plaintiff on behalf of the state agency. (R. 369-75.) Plaintiff told Dr. Shah that her pain is usually eight out of ten and is worse when the weather is cold, when she sleeps, and when she sits for more than 10 to 20 minutes. (R. 369.) She also complained of constant pain in her knee and said that physical therapy was not helping. (*Id*.) She reported that she was not taking any medication. (R. 370.) Dr. Shah performed a straight leg raising test, which caused pain in the knee and stretching in the back.[7] (R. 371.) Dr. Shah found that Plaintiff had a full range of motion in her knee however

---

"softening of the articular cartilage, most frequently in the patella." *Id.* at 352.

[6] The ALJ and the hearing transcript spell that doctor's name as "Dr. Goldfly" (R. 29, 49), but it appears on the treatment notes as "Dr. Goldflies." (*see* R. 389).

[7] The straight leg raising test involves the patient lying down and lifting an extended leg, with pain between 30 and 90 degrees of elevation indicating disease of the nerve roots in the lower back. *See Dorland's* at 1571, 1900.

painful, had full motor strength in all four extremities, and could walk with an antalgic gait for 50 feet without any assistive device. (*Id.*) Plaintiff reported tenderness in her lower back but refused to allow Dr. Shah to test her lumbar range of motion because she feared the pain it would cause. (*Id.*)

Four days after Dr. Shah's examination, Plaintiff followed up with Dr. Goldflies about her knee pain, stating that she finished physical therapy but that it did not help at all. (R. 388.) Dr. Goldflies opined that Plaintiff had possible nerve entrapment in her lower right extremity and recommended that an electromyogram be performed. (*Id.*) On October 29, 2010, the electromyogram of Plaintiff's legs showed normal results with no peripheral neuropathy, though Plaintiff refused the part of the test involving a needle. (R. 398.)[8]

On October 26, 2010, Dr. Francis Vincent reviewed Plaintiff's medical records at the request of the state disability agency. (R. 376-83.) He found that Plaintiff could perform light work.[9] She could lift 20 pounds occasionally and ten pounds frequently; sit, stand, or walk for about six hours in an eight-hour workday; and push and pull without limitation. (R. 377-78.) He also opined that

---

[8] Electromyography is "an electrodiagnostic technique for recording the extracellular activity (action potentials and evoked potentials) of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation" and is "performed using any of a variety of surface electrodes, needle electrodes, and devices for amplifying, transmitting, and recording the signals." *Dorland's* at 602.

[9] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b) and 416.967(b)

Plaintiff could stoop only occasionally and never climb ladders, ropes, or scaffolds, but had no other postural limitations. (*Id.* at 378.)

On November 6, 2010, Plaintiff again saw Dr. Goldflies about her knee pain. (R. 403.) Plaintiff rated the pain at nine out of ten and requested pain medication but refused a knee injection. (*Id.*)

Two months later, in January 2011, Dr. Richard Bilinsky examined Plaintiff's medical records on behalf of the state agency. (R. 406-13.) He noted that he reviewed the reports from October 9 and November 6. (R. 413.) His assessment was the same as Dr. Vincent's except that he concluded that Plaintiff could only occasionally kneel, crouch, and crawl, and could occasionally climb ladders, ropes, and scaffolds. (R. 407-08.) He also opined that Plaintiff should avoid concentrated exposure to hazards. (R. 410.) He concluded that her allegations were only "partially credible in light of evidence in the file." (R. 413.)

In February 2011, Dr. Sueann Nagpal began treating Plaintiff for bronchitis. (R. 432.) Plaintiff marked on the intake form that she "currently" or "in the past year" had experienced back and leg pain, but the treatment note from the February visit does not mention either condition. (R. 426, 432.) Plaintiff returned to Dr. Nagpal in June 2011, complaining of tingling or numbness in her feet and lower back pain. (R. 434.) Plaintiff reported that both feet were tingling and losing feeling, and that this condition had existed for "2/3 weeks." (R. 437.) Plaintiff did not report taking any medications. (*Id.*) Dr. Nagpal noted tenderness in the muscles in the spine region and reported that Plaintiff had "mild distress." (R. 434.) A straight leg raising test done at the visit was negative, and Plaintiff's pain was greater in extension than in flexion. (*Id.*) Dr. Negpal gave Plaintiff a handout about back care and told her to return in a week "if not back to normal." (*Id.*) Plaintiff returned to Dr. Nagpal on September 1, 2011, for treatment of a cyst on her earlobe. (R. 435.) The review of all other

systems was "negative." *(Id.)* Plaintiff did not mention any other problem. (R. 436.) Plaintiff was not taking any medication. (*Id.*)

### The Hearing

Plaintiff was represented by counsel at the hearing before the ALJ on April 2, 2012. (R. 41.) She testified that she resigned from her last job—where she washed, dried, and folded clothes at a laundromat—shortly before her back surgery. (R. 44, 50.) She said that she visits Dr. Chang about her back "once in awhile," with the last time being about four months earlier. (R. 45.) However, in response to her attorney's question at the end of the hearing, Plaintiff testified that she had not seen the doctor for back pain, and her attorney indicated there were no additional medical records. (R. 63-64.)[10]

Plaintiff stated that Dr. Chang had limited her to lifting no more than five pounds but did not have plans for additional treatment for her back. (R. 46-48.) She claimed that surgery had not helped her back at all; rather, she said, "The only thing it helped me with was losing complete feeling in both my legs to where I was hitting the floor." (R. 51.) She took a prescription painkiller for seven months following surgery but stopped because it made her feel "like a zombie." (R. 48.) At the time of the hearing, she was taking only over-the-counter medication. (*Id.*) As for knee pain, she testified that she had not seen Dr. Goldflies in seven or eight months and that he administered cortisone shots but they did not help with her pain. (R. 49.) She also said that she did not go to see him or any other doctors about her knee pain because she found it "hard to sit in a car." (R. 49-50.)

---

[10] The last record of a visit with Dr. Chang is a post-surgery follow-up in November 2009. (R. 278.)

As for daily activities, Plaintiff said that her husband usually takes care of her two children, ages ten and eleven, and cooks and cleans. (R. 46.) She also stated that she could only sit comfortably for 20 to 30 minutes and then needs to stand for ten to 15 minutes, and that she can only lift about two and a half pounds. (R. 52.) She spends half of her time during the day sitting and half standing. (*Id.*) She added that she had fallen since her surgery and that Dr. Chang and Dr. Tomacruz suggested that she use a cane but she does not because it is hard to get used to. (R. 53-54.)

The ALJ then asked a vocational expert ("VE") a series of questions about Plaintiff's potential employment. (R. 55-63.) First, the ALJ described the most-severe restrictions found by the state-agency doctors, limiting Plaintiff to frequent lifting of ten pounds; standing, walking, or sitting six hours in an eight-hour workday; occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; and no direct work with hazardous machines. (R. 55-56.) With those restrictions, the VE testified, Plaintiff could perform her past work as a packing line worker or cashier at a gas station, or a number of other jobs including working as a housekeeping cleaner. (R. 56-57.)

The ALJ then asked the VE what jobs Plaintiff could perform with capacity to lift and carry ten pounds frequently, stand and walk two hours in an eight-hour workday, and sit six hours in an eight hour workday, but could sit for only 30 minutes at a time before alternating to standing or walking for up to 30 minutes, and could not be exposed to hazardous machines with moving, mechanical parts. (R. 59.) The VE answered that Plaintiff's past work would be too physically demanding but that she could work as a gauger of protective devices, an order clerk for food or beverage, or a

surveillance system monitor. (R. 59-60.)[11] If the Plaintiff were limited to handling occasionally rather than frequently, the security system monitor jobs, of which there are 2,500 in the regional economy, would remain. (R. 61.) If Plaintiff had to be absent from work an average of two days per month, she would not be able to hold that job. (*Id*.)

On cross-examination, the VE testified that if Plaintiff needed a sit/stand option at will she could still perform the security monitor job unless her concentration was off task 15% or more. (R. 62-63.) Likewise, if she needed not only to sit or stand at will but also to walk around to alleviate pain, that would make her unemployable. (R. 63.)

**Disability Determination Process**

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. Under the regulations, the Commissioner must consider: (1) whether the claimant has performed any substantial gainful activity during the period for which she claims disability; (2) if she has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's

---

[11] A gauger of protective devices, according to the Dictionary of Occupational Titles, code 712.687-018, sorts and measures surgical sutures, rejecting strands of suture that are unacceptable and readying acceptable strands for clamping onto needles.

impairment meets or equals any impairment listed in the regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work; and (5) if the claimant cannot perform her past relevant work, whether she is unable to perform any other work existing in significant numbers in the national economy. *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). An affirmative answer at steps one, two or four leads to the next step. *Id.* at 886. An affirmative answer at steps three or five requires a finding of disability, whereas a negative answer at any step other than step three precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one to four, and if that burden is met, at step five the burden shifts to the Commissioner to provide evidence that the claimant is capable of performing work existing in significant numbers in the national economy. 20 C.F.R. § 404.1560(c)(2); § 404.1520(g).

**The ALJ's Decision**

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since the alleged onset of her disability. (R. 26.) At step two, the ALJ found that the claimant had two severe impairments: status post lumbar fusion and laminectomy, and osteoarthritis in the right knee. (*Id.*) At step three, the ALJ found that neither of Plaintiff's impairments met or equaled the severity of any disability listing, including listing 1.02, for major dysfunction of a joint, and listing 1.04, for disorders of the spine. (R. 27.)

The ALJ then determined that Plaintiff had the RFC to perform sedentary work except that she could lift and carry ten pounds frequently. She can stand or walk for at least two hours in an eight-

hour workday. Plaintiff can sit for six hours, handle objects frequently, and occasionally balance, stoop, kneel, crouch, and climb ramps and stairs, but cannot climb ladders or work directly with hazardous machines with moving mechanical parts. Plaintiff would need the option to sit or stand in alternating intervals of 30 minutes. (R. 27.)

In assessing this RFC, the ALJ explained that she gave some weight to the opinions of Dr. Vincent and Dr. Bilinsky, the state agency doctors, but that they had not reviewed subsequent documentation and testimony that the ALJ found supported additional limitations. (R. 30-31.) The ALJ also decided that, given this level of functioning, Plaintiff could not perform any of her past relevant work. (R. 31.) Finally, at step five, the ALJ decided that Plaintiff could work in the positions mentioned by the VE. (R. 32.)

The ALJ also concluded that Plaintiff's complaints of debilitating back and knee pain were not credible. (R. 29-31.) The ALJ stated that Plaintiff had refused injections for her back pain and, except for her single visit to Dr. Negpal in June 2011, had not complained of back pain to her treating physician for more than a year. (R. 31.) Moreover, the ALJ explained, during her visit to Dr. Negpal, Plaintiff reported that her symptoms began only two weeks to a month earlier, and Plaintiff "did not return as instructed if she continued to have difficulties." (R. 31-32.) Additionally, the ALJ observed that Plaintiff had testified to a continuing five-pound lifting restriction from Dr. Chang, but there was no documentation to support that limitation, and in fact, "the records reveal that [Plaintiff] recovered" from her surgery. (R. 31.) With respect to Plaintiff's knee, the ALJ noted that testing had shown no structural damage to the knee that would restrict movement, that Plaintiff had treated the pain only occasionally, and that she does not use an assistive device to walk. (R.30.)

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner. *See* 42 U.S.C. § 405(g). Where the Appeals Council declines a requested review of an ALJ's decision, it constitutes the Commissioner's final decision. *Villano*, 556 F.3d at 561-62. While an ALJ's legal conclusions are reviewed *de novo*, her factual determinations are reviewed deferentially and are affirmed if they are supported by substantial evidence in the record. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Evidence is substantial if it is sufficient for a reasonable person to accept it as adequate to support the decision. *Jones*, 623 F.3d at 1160; *Craft*, 539 F.3d at 673. "Although this standard is generous, it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not select and discuss only the evidence that favors her ultimate conclusion. *See Murphy v. Astrue*, 496 F.3d 630, 634-35 (7th Cir. 2007); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Although the ALJ is not required to discuss every piece of evidence, the ALJ must provide an accurate and logical bridge between the evidence and the conclusion, so that a reviewing court may assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review. *Craft*, 539 F.3d at 673. "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano*, 556 F.3d at 562.

## DISCUSSION

Plaintiff argues that the ALJ failed to provide a proper basis for the assessed RFC because the

ALJ accepted part of Plaintiff's testimony and used it as the basis for determining that Plaintiff has an RFC more limited than the state agency doctors found, but failed to explain properly what evidence led the ALJ to that "middle ground." (Pl.'s Reply at 2.) Plaintiff also claims that the ALJ improperly discredited Plaintiff's testimony about her pain. (Pl.'s Mem. at 11.)

"The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). . . . The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." S.S.R. 96-8p, 61 FR 34474-01. An ALJ's failure to explain the conclusions in an RFC assessment "in itself is sufficient to warrant reversal of the ALJ's decision." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). The ALJ's decision will be upheld, however, if the ALJ minimally articulated the required narrative in a way that allows the court to follow the ALJ's reasoning about the RFC and determine that substantial evidence supported the ALJ's assessment. *See Filus v. Astrue,* 694 F.3d 863, 869 (7th Cir. 2012); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Boucek v. Astrue*, No. 08 CV 5152, 2010 WL 2491362 at *7-8 (N.D. Ill. June 16, 2010).

Here, the ALJ's assessed Plaintiff's RFC as more limited than the agency doctors found. Dr. Vincent opined that Plaintiff could perform *light* work, and Dr. Bilinsky concurred, adding only some further postural limitations. (R. 30-31.) The ALJ, however, concluded that Plaintiff could do *sedentary* work, and that Plaintiff could stand or walk at least two hours during a workday (as opposed to the six hours stated by the agency doctors), and that she would need the option to sit or stand at alternating 30-minute intervals. (R. 27.) While the agency doctors found Plaintiff could lift or carry 20 pounds occasionally and ten pounds frequently (R. 377, 407), the ALJ did not address

lifting 20 pounds but agreed the Plaintiff could lift ten pounds frequently (R. 27). The additional restrictions appear to be based on Plaintiff's own testimony that she could sit comfortably for only 20 to 30 minutes and would then stand for ten to 15 minutes. (R. 52.) On the other hand, the ALJ did not accept Plaintiff's testimony that she can only lift two and a half pounds, and that she cannot concentrate because of the pain. (R. 52-53.)

Plaintiff's central argument is that the ALJ "rejected" the state agency doctors' opinions and, therefore, she argues, there is no medical evidence in the record to support the ALJ's assessment of the RFC, creating "an evidentiary deficit." (Pl.'s Mem. at 8-10.) In fact, the ALJ actually assigned them "some weight" but concluded that the consulting doctors did not have an opportunity to consider "subsequent documentation and testimony" (R. 30), apparently referring to Plaintiff's testimony and her June 2011 consultation with Dr. Nagpal for tingling and numbness.

In the Commissioner's view, the ALJ cannot be faulted for "tempering a physician's opinions in a claimant's favor." (Def.'s Mem. at 4.) The Commissioner cites *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012):

> The ALJ could have been more explicit in tying this mitigating gesture to evidence in the record, but we are aware of no controlling authority holding that the full adverse force of a medical opinion cannot be moderated favorably in this way unless the ALJ provides an explanation for extending the claimant such a benefit. . . . Here, we hold only that, if a medical opinion adverse to the claimant has properly been given substantial weight, the ALJ does not commit reversible error by electing to temper its extremes for the claimant's benefit.

Plaintiff argues that there is no Seventh Circuit precedent permitting an ALJ to "temper" a claimant's RFC in this way without citing specific medical evidence. (Pl.'s Reply at 3-5.) However, Plaintiff does not point to any medical evidence in the record that supports greater current limitations than the ALJ found. Plaintiff points to problems with her back that predate her 2009 successful

surgery and to her 2010 knee condition that the ALJ discussed. (Pl.'s Reply at 5, citing R. 30.-31.) To "temper" the agency doctors' assessment, then, the ALJ gave Plaintiff the benefit of some, but not all of her complaints of pain. The ALJ also explained why she did not credit all of those complaints, and tied that explanation to the record. (R. 29-31.)

Plaintiff argues that the ALJ should have done more after determining that the state agency doctors had not considered later documentation and testimony that supported additional limitations. (Pl.'s Mem. at 10-11.) Acknowledging that a claimant bears the burden of presenting evidence of her impairments, Plaintiff notes that an ALJ has a responsibility to recognize the need for additional evaluations if she determines that the claimant's evidence is insufficient. *See Bates v. Colvin*, 736 F.3d 1093, 1101 (7th Cir. 2013); *Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011). The problem with Plaintiff's position, however, is that there is no indication that additional medical evaluation would result in further restrictions than the ALJ assessed. The state agency doctors evaluated Plaintiff's back and knee pain in late 2010 and early 2011. (R. 376-83, 406-13.) After that time, by Plaintiff's own account, she stopped taking medication other than over-the-counter painkillers, visited her doctors infrequently, and her treating physicians had no plans for additional treatment of her back or knee pain. The only record of a complaint relating to her back or knee is her visit to Dr. Nagpal about her back and feet in June 2011, but the doctor did not prescribe any treatment, nor is there any record of Plaintiff following up as instructed if she remained in pain. (R. 434.) The ALJ asked Plaintiff's attorney at the hearing whether there were any additional records to add, and received a negative response. (R.63-64.) Although the ALJ has a duty to develop a full and fair record, "completeness of an administrative record is generally committed to the ALJ's discretion." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014); *see Smith v. Apfel*, 231 F.3d 433, 443 (7th Cir.

2000). The court is not persuaded that the ALJ abused that discretion in deciding not to request additional statements from medical sources when there was no indication that request would yield any additional restrictions on Plaintiff's RFC.

Plaintiff's central argument is that, if the ALJ found that Plaintiff was credible enough to justify a more limited RFC than the agency doctors found, the ALJ erred in failing to explain why she did not accept all of Plaintiff's testimony. Plaintiff argues that the ALJ committed several errors in finding her testimony not credible to the extent it was inconsistent with "the substantial evidence which forms the basis for the above residual functional capacity assessment." (R. 29.)

"The ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying." *Jones*, 623 F.3d at 1160. "Rather than nitpick the ALJ's opinion for inconsistencies or contradictions," the court will "give it a commonsensical reading" and "reverse credibility determinations only if they are patently wrong." *Id.* To show that the determination was patently wrong, Plaintiff "must do more than point to a different conclusion that the ALJ could have reached . . . ." *Id.* at 1162.

Plaintiff first criticizes the ALJ for using boilerplate language about her statements being "not credible to the extent they are inconsistent with the substantial evidence" underlying the RFC assessment. (Pl.'s Mem. at 11-12.) The Seventh Circuit has warned that this type of analysis "gets things backwards" because it "implies that ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). As Plaintiff acknowledges, however, use of this boilerplate does not require reversal if the ALJ goes on to identify evidence justifying her credibility determination. *See Pepper*, 712 F.3d 351, 367-68 (7th Cir. 2013); *Filus*, 694 F.3d at 868.

Here, the ALJ explained why she discredited Plaintiff's testimony and tied that conclusion to the evidence. First, the ALJ observed that the medical records do not show that Plaintiff has continuing back and knee problems. The ALJ went through the records of Plaintiff's recovery from her 2009 back surgery which reported that the surgery was successful and her spine was healing well. (R. 29.) The ALJ considered important the fact that the record shows only one occasion in the prior year when Plaintiff complained of back pain to her treating physician. At that time, the examination showed mild symptoms, which Plaintiff reported began two weeks to a month prior, and Plaintiff did not return for further treatment. (R. 31.) At the hearing, the ALJ asked if there were further records and was assured there were none. (R. 63-64.)

Additionally, the ALJ also pointed out that, although Plaintiff claimed that Dr. Chang restricted her to lifting no more than five pounds, there are no medical records to support a restriction on lifting. (R. 31.) At the hearing, the ALJ specifically asked Plaintiff's attorney and received assurance that the records from Dr. Chang were complete. (R. 52.) In contrast to Plaintiff's asserted limitation, the ALJ noted the agency doctor's report that Plaintiff has full motor strength in all four extremities and normal grip strength. (R. 30.) The ALJ commented that, although it was reasonable to assume some lifting restriction immediately following surgery, nothing in the record shows that any such restriction continued. (R. 31.)

One of Plaintiff's arguments is well taken: the ALJ mistakenly stated that Plaintiff refused injections for her back pain after her surgery (R. 31); Plaintiff actually refused *knee* injections, as the ALJ reported correctly elsewhere in her opinion. (R. 30, citing R. 403.) But that mistake does not undermine the ALJ's main point that Plaintiff's complaints of continuing severe pain were not supported by her medical records.

18

Plaintiff argues that the ALJ erred by addressing only two of Plaintiff's statements—regarding her continued back and knee pain and the five-pound lifting restriction—rather than assessing the validity of all of her allegations, like Plaintiff's statement that she could only sit for 20-30 minutes and then had to stand for 10-15 minutes. (Pl.'s Mem. at 12-13.) However, the ALJ accommodated that testimony by including a sit/stand option every 30 minutes in Plaintiff's RFC.

Plaintiff also complains that the ALJ did not include a restrictions that Plaintiff "needed to walk around to alleviate her pain and . . . that she lost concentration due to pain." (Pl.'s Mem. at 9-10.) However, the ALJ did not ignore significant lines of evidence in failing to address these claims. The ALJ's opinion reflects that she considered Plaintiff's testimony on these points. (*See* R. 29-30.) Plaintiff's evidence on both of those points, however, was very limited. Plaintiff did not testify that she needs an option to walk at will. She testified that she walks around the house as much as she can to get the stiffness out of her back. (R. 49.) She further testified that she also stands to alleviate stiffness, and in a typical day she spends half of her time sitting and half standing. (R. 52.) The only evidence to support Plaintiff's claim that she cannot concentrate is her response to her attorney's question, "As a result of your pain, do you feel you can't concentrate?" to which Plaintiff answered, "No. I can't concentrate." (R. 53.) In contrast, Plaintiff also testified that she drives the car, although very seldom, that she helps her children with their homework, and that she uses the computer although infrequently. (R. 49-50.) Although the VE was asked hypothetical questions about absence from work, there is no evidence in the record that Plaintiff would need to be absent from work two days per month, or that she would be on task only 85% of the time. (R. 62.) In any event, the ALJ was not required to weigh the credibility of each of Plaintiff's assertions; reversal is warranted "[o]nly if the trier of fact grounds his credibility finding in an observation or argument that

is unreasonable or unsupported . . . ." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006).

Plaintiff then contends that the ALJ erred by not addressing the reasons why Plaintiff might not have obtained additional treatment. (Pl.'s Mem. 13-14.) For instance, Plaintiff testified that she had difficulty traveling to Dr. Goldflies's office, and Dr. Chang did not have a plan for additional treatment and told her that it would take awhile for her nerve damage to heal. (*Id.* at 14.) An ALJ may discredit a claimant on the basis of infrequent treatment or failure to follow treatment plans, but must not draw inferences against the claimant if the ALJ has not explored the claimant's explanations for the lack of medical care. S.S.R. 96-7p; *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014); *Craft*, 539 F.3d at 679.

The ALJ did, however, explore Plaintiff's reasons for not getting additional treatment. The ALJ questioned Plaintiff at the hearing about what Dr. Chang's treatment plans were, why Plaintiff had discontinued her prescription painkiller, and why she did not go back to see Dr. Goldflies or somebody else about her knee pain. (R. 47-50.) In her opinion, the ALJ noted that Dr. Chang's records show that Plaintiff recovered from her back surgery. The ALJ discussed Plaintiff's difficulty traveling to visit Dr. Goldflies, also noting that Plaintiff's brother drives her where she needs to go. (R. 28-29, 47-50.) Significantly, the ALJ noted that Plaintiff has a treating doctor, Dr. Nagpal, whom Plaintiff consults for various conditions, including her complaint about back pain in June 2011, but that when Plaintiff most recently consulted Dr. Nagpal, she failed to mention any back or knee pain. (R. 30, citing 434-35.) Thus, the ALJ properly considered Plaintiff's reasons for not getting further treatment.

Finally, Plaintiff argues that the ALJ improperly discredited Plaintiff's statement that Dr. Chang limited her to lifting only five pounds, while also determining she could lift ten pounds frequently.

(Pl.'s Mem. at 15-16.)   Again, the ALJ correctly noted that there is nothing in the medical record that indicates any doctor restricted Plaintiff to five pounds, while the ALJ's assessment that she could lift ten pounds was supported by the agency physicians.  (R. 31, 377, 407.)

Accordingly, the court finds that the ALJ's opinion is supported by substantial evidence.

Moreover, even if the ALJ erred, remand is inappropriate if the court is convinced that the ALJ will reach the same result on remand.  *Pepper*, 712 F.3d at 367; *accord McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *see also Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013) ("[W]e will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same.").  That is the situation here.  If the ALJ had given controlling weight to the medical opinions in the record, Plaintiff would not be disabled.  Instead, the ALJ gave some credence to Plaintiff's complaints of discomfort when sitting more than 30 minutes and when walking and standing.  Plaintiff has pointed to nothing, other than her own testimony (which the ALJ partially credited and partially discredited), to show that additional information would have supported more severe limitations.  Thus, remand for the ALJ to explain her RFC finding further is unwarranted.

## CONCLUSION

For the foregoing  reasons, the Commissioner's motion for summary judgment [dkt 23] is granted.

_____
Geraldine Soat Brown
United States Magistrate Judge

Date: December 10, 2014